# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 07-3166

_____

| | | |
|---|---|---|
| Kathleen M. Hackett, | * | |
| | * | |
| Plaintiff - Appellant, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the District |
| | * | of South Dakota. |
| Standard Insurance Company, | * | |
| | * | |
| Defendant - Appellee. | * | |

_____

Submitted: September 22, 2008
Filed: March 19, 2009

_____

Before BYE, BEAM, and COLLOTON, Circuit Judges.

_____

BYE, Circuit Judge.

Kathleen Hackett appeals the district court's order affirming Standard Insurance Company's denial of long-term disability benefits under her employer-funded insurance policy. We reverse and remand.

I

Hackett was an employee of Mileage Plus Inc. (MPI) in Rapid City, South Dakota, for fourteen years, eventually serving as a customer service supervisor. As a benefit of her employment, MPI provided disability insurance under a benefit plan

(Plan) issued by Standard.[1]  The Plan provides disability benefits for the first twenty-four months after the onset of a disability if the insured is unable to work at her "own occupation."  To continue receiving benefits after twenty-four months, the insured must demonstrate an inability to work at "any occupation" as defined by the Plan.  The Plan defines "any occupation" benefit eligibility as:

> During the Any Occupation Period you are required to be Disabled from all occupations.  You are disabled from all occupations if, as a result of Sickness, Injury or Pregnancy, you are unable to perform with reasonable continuity the material duties of any gainful occupation for which you are reasonably fitted by education, training and experience.

Standard determined employment paying $2600 per month or more would qualify as gainful occupation considering Hackett's experience and abilities.

Hackett asserts she is disabled by the residual effects of a brain hemorrhage suffered on September 28, 2002.  On that day, she was taken to the hospital and seen by a neurologist, Dr. James Nabwangu.  She underwent emergency surgery and was released from the hospital eleven days later with instructions to follow up with Dr. Nabwangu.

On November 5, 2002, Dr. Nabwangu noted Hackett had "done exceptionally well" since the surgery, and was planning on returning to work part time at MPI, beginning November 7, 2002. On December 3, 2002, Hackett again saw Dr. Nabwangu and reported her ability to focus was improving and she was able to do computer work when not distracted.  Hackett also reported she was extremely tired after seven hours of work.  Dr. Nabwangu indicated she should remain working thirty hours a week and could resume driving.

---

[1]The parties agree the Plan is governed by the Employee Retirement Income Security Act (ERISA), 29 U.S.C. §§ 1001-1461.

After returning to MPI, Hackett continued to receive medical treatment. Hackett's internist, Dr. James Bowman, saw her in early 2003 and noted Hackett was "doing very well" and had more energy, but had suffered a slight headache earlier in the day. On January 15, 2003, Hackett reported to Dr. Bowman she was suffering from a severe headache, which was worse when she did "work on the computer with numbers." On March 21, 2003, Dr. Bowman noted Hackett had "a lot of mood lability" and was unable to focus at her job, but had not had problems with severe headaches. On April 21, 2003, Dr. Bowman noted Hackett still suffered from "occasional" headaches, but her mood had improved.

On February 28, 2003, Hackett applied to Standard for "own occupation" disability benefits, asserting the effects of the hemorrhage rendered her unable to perform her duties as a customer service supervisor. On May 1, 2003, Standard approved her disability claim from December 26, 2002, through January 17, 2003, but found she was able to return to work after January 17, 2003.

On May 6, 2003, Hackett ended her employment with MPI. She visited Dr. Nabwangu the same day and he noted Hackett "had to quit her job today, because she is really unable to handle the duties demanded of her, due to intellectual impairment of some confusion; etc."

On June 17, 2003, Hackett was readmitted to the hospital after feeling "confused" while working as a receptionist. She was diagnosed with cerebral ischemia and discharged after three days of treatment with plans for physical and occupational therapy and home medication. Hackett was terminated from the part-time receptionist job because her employer needed someone there every day.

Hackett appealed Standard's determination she could return to work effective January 17, 2003, and submitted a report from Dr. Nabwangu made after the May 6, 2003, visit, which stated:

I do genuinely believe that this patient may very well have difficulty, because of some residual permanent impairment of her intellectual functions in dealing with a kind of job that she has been responsible for. A less structured and less demanding job intellectually, may be more appropriate. Under the circumstances, I have requested a psychological evaluation; and hopefully with these recommendations, her insurance company will be more amenable to social re-adaptation, in order to find her a more suitable position.

Based upon Dr. Nabwangu's note, as well as possible cognitive problems and the June 17 hospitalization, Standard reopened her file and found Hackett disabled under the "own occupation" portion of her disability insurance policy on June 23, 2003.

Following the June 17 hospitalization, Dr. Nabwangu referred Hackett to Dr. John E. Meyers, a clinical neuropsychologist. On June 21, 2003, Dr. Meyers conducted a battery of tests and determined Hackett's verbal IQ fell within the high average range and her performance IQ within the low average range. Although Dr. Meyers noted the scores were below her expected range of function, "[t]he difference between her expected performance and her actual performance was not significant."

Hackett began seeing neurologist Dr. Steven Hata, and on July 17, 2003, he noted she had recovered well but complained of headaches linked to computer usage. Dr. Hata noted Hackett's "neuropsych testing shows performance scores decreased; however, verbal and other scores are normal." Cognitive functions were also normal. Hackett saw Dr. Hata again in August of 2003, and he noted her headaches had decreased to every four days after modification of her medication.

In September of 2003, Standard advised Hackett she may be eligible for social security benefits and referred her to a firm which assisted with social security applications. On August 25, 2005, Hackett was found disabled and awarded benefits.

Hackett began to see neurologist Dr. Allen Gee, who noted on March 26, 2004, that Hackett reported severe headaches which had begun two months after the brain hemorrhage. On April 9, 2004, Hackett reported she had suffered a constant headache for the past week. Dr. Gee instructed her to keep a "headache diary." On May 7, 2004, Dr. Hata noted Hackett's headaches had improved, she only suffered a headache once in every three days, and only needed to take medication twice in the past month for severe headaches. On July 23, 2004, Dr. Gee noted Hackett was suffering from frequent headaches, but they were reduced in intensity and only required medication once or less per month. In July 2004, Hackett was also examined by Dr. Monte S. Dirks, who found she had suffered a thirty-eight percent loss to her total visual system.

In late 2004, Standard reviewed Hackett's disability claim under the "any occupation" provision of the Plan. Standard provided Hackett's medical records to Dr. Lawrence Zivin, a board certified neurologist and consultant to Standard. Dr. Zivin reviewed the records and concluded Hackett was able to perform sedentary to light job activity, with accommodations made for her left visual field. Dr. Zivin opined her cognitive ability was in the normal range. In January 2005, Standard sent a claims consultant to interview Hackett. The consultant reported Hackett was able to drive, speak clearly, and answer questions in a clear and concise manner.

In June 2005, Standard ordered a transferable skills assessment. A vocational case manager (VCM) assessed Hackett's transferrable skills based upon Dr. Zivin's report. The VCM found Hackett had the ability to perform full-time sedentary work activities, with a possible vision accommodation, and there were positions available in her area that constituted gainful employment under the "any occupation" definition of the Plan.

On August 11, 2005, Standard denied Hackett's application for "any occupation" disability benefits. Standard stated Hackett's previous position with MPI

qualified as "light work" with regard to the amount of physical activity the position entailed. Based on the reports of Hackett's physicians as well as Dr. Zivin, Standard found Hackett was incapable of performing light work, but found her capable of performing "full-time sedentary work with reasonable continuity and accommodation for left visual field compromise." Standard stated the VCM had found positions which Hackett could perform, and therefore she did not qualify for "any employment" benefits.

Hackett appealed Standard's determination and submitted additional records. Standard provided the additional documentation to Dr. Elias Dickerman for an independent medical review. Dr. Dickerman found Hackett's difficulty with headaches, though consistent, had reduced in severity. He also concluded testing revealed cognitive scores within a normal range, and medical evidence did not support specific restrictions on Hackett's occupational abilities.

Standard upheld its original decision denying Hackett "any occupation" disability benefits, stating:

> Dr. Bowman's chart note of November 3, 2005 states that Ms. Hackett does continue to experience a headache every two to three days. Dr. Bowman's chart-note also indicates that Ms. Hackett performs computer work for the business she shares with her husband. The chart note also indicates that a one year old relative has recently been placed into the custody of Ms. Hackett and her husband and as of the date of that chart note was residing with Ms. Hackett. Ms. Hackett verified her ability to drive during an in-person interview conducted by Duane Hennings in January 2005. Ms. Hackett stated a preference to avoid nighttime driving due to her vision but did not confirm any formal restriction to her driving.

Standard acknowledged the social security decision awarding benefits, but noted Hackett's claim was evaluated under the terms of the Plan, which differed from

-6-

those used by the Social Security Administration. Standard noted the record did not demonstrate Hackett to have a "specific cognitive limitation or mental limitation from the brain hemorrhage," and "Hackett's headaches are under fair control and do not require significant intervention with medications." Accordingly, Standard upheld its August 11, 2005, decision denying Hackett "any occupation" benefits.

Hackett challenged the appeal and it was then reviewed by Standard's Quality Assurance Unit, which issued its findings on April 9, 2006. The Quality Assurance Unit upheld Standard's denial of benefits.

Hackett sued Standard arguing it improperly denied her claim for "any occupation" disability benefits. Hackett argued Standard was operating under a conflict of interest because it was both the plan administrator and had discretionary authority to interpret and apply plan language. The district court, applying Woo v. Deluxe Corp., 144 F.3d 1157, 1160 (8th Cir. 1998), held Standard was operating under a conflict of interest but the conflict could not be considered because Hackett failed to prove any serious breach of Standard's fiduciary duty. After concluding the conflict of interest could not be factored into its review, the district court held Standard did not abuse its discretion in denying Hackett's claim.

On appeal, Hackett argues the district court improperly relied on this court's holding in Woo when it concluded the conflict of interest could not be considered. Hackett further argues the district court erred in concluding Standard did not abuse its discretion when it denied her claim for disability benefits. Because the district court should have considered the conflict of interest in determining whether Standard abused its discretion, we reverse and remand.

II

We review de novo the district court's summary judgment ruling, <u>Cash v. Wal-Mart Group Health Plan</u>, 107 F.3d 637, 640 (8th Cir. 1997), including whether the district court applied the appropriate standard of review to the administrator's decision, <u>Clapp v. Citibank, N.A. Disability Plan</u>, 262 F.3d 820, 826 (8th Cir. 2001). The district court applied an abuse of discretion standard, which is appropriate when an ERISA plan grants discretionary authority to the plan administrator to determine eligibility for benefits. <u>Firestone Tire & Rubber Co. v. Bruch</u>, 489 U.S. 101, 115 (1989). Hackett agrees the plan grants Standard discretionary authority. Nonetheless, she argues the district court erred by not applying a de novo standard of review because Standard was operating under a conflict of interest.

In <u>Woo</u>, this court approved a two-part test for determining whether a district court should apply a de novo or abuse of discretion standard of review to a plan administrator's denial of benefits. Under <u>Woo</u>, a claimant seeking de novo review by the district court, had to "present material, probative evidence demonstrating that (1) a palpable conflict of interest or a serious procedural irregularity existed, which (2) caused a serious breach of the plan administrator's fiduciary duty." 144 F.3d at 1160. Here the district court concluded Standard was operating under a conflict of interest, but found Hackett failed to prove a serious breach of fiduciary duty. Accordingly, the conflict of interest was not a factor in the district court's review of Standard's decision denying benefits. In light of the Supreme Court's intervening decision in <u>Metropolitan Life Insurance Co. v. Glenn</u>, 128 S. Ct. 2343 (2008), however, the district court understandably erred in failing to consider the conflict.

In <u>Glenn</u>, the Court concluded a conflict of interest exists whenever the plan administrator is also the employer or insurance company which ultimately pays benefits. <u>Id.</u> at 2348. Additionally, <u>Glenn</u> resolved the question of how the conflict should be considered when determining if a plan administrator abused its discretion.

-8-

Under Woo, if a claimant proved a conflict of interest, he also had to prove a serious breach of the plan administrator's fiduciary duty. If the claimant met the Woo test, the district court would review the administrator's decision using a sliding-scale approach, decreasing the "deference given to the administrator in proportion to the seriousness of the conflict of interest." 144 F.3d at 1161. In Glenn, the Supreme Court made clear the conflict does not change the standard of review applied by the district court. Rather, "a conflict should 'be weighed as a factor in determining whether there is an abuse of discretion.'" Glenn, 128 S. Ct. 2350 (quoting Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989) (additional quotation and citation omitted)). In this instance, the district court erred by concluding the conflict of interest could not be taken into account.

The importance of taking Standard's conflict of interest into account is illustrated by the "combination-of-factors method" employed by the Court in Glenn, where the conflict serves "as a tiebreaker when the other factors are closely balanced" and is "more important . . . where circumstances suggest a higher likelihood that it affected the benefits decision" and "less important . . . where the administrator has taken active steps to reduce potential bias and to promote accuracy." Id. at 2351. In Glenn, the Court concluded the conflict took on even greater significance because, as in this case, the insurer 1) encouraged the claimant to apply for social security disability benefits, and then disregarded the Social Security Administration's finding she could do no work, and 2) emphasized medical records which supported a denial of benefits over records suggesting a contrary conclusion. Id. at 2352.

Because the district court failed to consider the conflict when it evaluated the plan administrator's decision, we reverse and remand, thereby allowing the district court to reconsider its decision in light of Glenn. See Jones v. Mountaire Corp. Long Term Disability Plan, 542 F.3d 234, 240 (8th Cir. 2008) (declining to apply the Glenn test in the first instance and remanding to the district court for reconsideration of the standard of review).

## III

The judgment of the district court is reversed, and we remand for further proceedings in accordance with this opinion.

_____