# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 09-1058

_____

Jerry B. Darvell,

        Appellant,

v.

Life Insurance Company of
North America,

        Appellee.

\*
\*
\*
\*  Appeal from the United States
\*  District Court for the
\*  District of Minnesota.
\*
\*
\*
\*
\*

_____

Submitted: October 22, 2009
Filed: March 10, 2010

_____

Before COLLOTON and BENTON, Circuit Judges, and PIERSOL,[1] District Judge.

_____

BENTON, Circuit Judge.

Jerry B. Darvell was denied long-term disability benefits by Life Insurance Company of North America ("LINA"). The district court[2] granted LINA's motion for summary judgment, finding that it did not abuse its discretion in determining that he

_____

[1] The Honorable Lawrence L. Piersol, United States District Judge for the District of South Dakota, sitting by designation.

[2] The Honorable Patrick J. Schiltz, United States District Judge for the District of Minnesota.

was not disabled. Darvell appeals. Having jurisdiction under 28 U.S.C. § 1291, this court affirms.

## I.

Beginning in May 2003, Darvell worked for Yellow Book USA, Inc., as an account representative in the Duluth area. His job involved in-person calls to sell new advertising, while carrying a book of advertising and account information that weighed about 35 pounds. He claims he was disabled by three conditions: reflex sympathetic dystrophy (a pain syndrome), osteoarthritis in both shoulders, and depression. He asserts that these conditions prevented him from the driving, walking, and carrying involved in his job.

Darvell has a history of shoulder, arm, and hand pain stemming from a 1980 car accident. He is under the care of Dr. Douglas Johnson, a family practitioner; Dr. Raymond Hausch, a rheumatologist; and Dr. Thomas Kaiser, an orthopedic surgeon. These doctors diagnosed Darvell with the three conditions that he bases his claim on.

In October 2004, Darvell's symptoms got worse. He complained to both Dr. Hausch and Dr. Kaiser of increased pain. He reported having trouble with pushing, pulling, and lifting, and not being able to lift his right arm above shoulder level. He also experienced crepitus (grinding and crackling) with the movement of his shoulders. X-rays revealed progressive osteoarthritis in both shoulders, with the right shoulder significantly worse than the left, as well as osteophyte formation in the right shoulder joint.

Both Dr. Hausch and Dr. Kaiser restricted Darvell to sedentary work (lifting up to ten pounds and occasional walking and standing). Dr. Hausch stated, "I do not see any way [Darvell] can continue to do any work or sustain gainful employment given

the amount of arthritis in his shoulder and also his reflex sympathetic dystrophy.. . . I do believe this patient is disabled and is unable to sustain gainful employment." Dr. Kaiser noted that Darvell had "a major problem right now with depression and anxiety."

A few days later, Darvell saw Dr. Johnson, who said that "depression was becoming a greater and greater part of his disability" and that he "should be on disability due to depression." Dr. Johnson prescribed an antidepressant.

For the next four months (through February 2005), Darvell's doctors restricted him to sedentary work. On February 9, Dr. Johnson said that each of his conditions (RSD, osteoarthritis, and depression) was disabling, precluding gainful employment of any kind. Dr. Johnson also noted that antidepressants had improved Darvell's symptoms of depression, alleviating any need to see a psychiatrist. A week later, after a clinic visit, Dr. Johnson again noted that Darvell's symptoms of depression were improving. On March 4, according to Dr. Johnson, Darvell's right shoulder was "jelling much more" and he had a limited range of motion and increased pain with any type of movement. At this point, Dr. Johnson decided to order Darvell to stop working altogether. He authored a second letter on March 30 — essentially identical to the February 9 letter — again opining that each of the three conditions was disabling, that Darvell was unable to work as a result of each condition, and that he did not believe that Darvell could ever return to work as an account executive. Darvell's other doctors agreed he was disabled and should not be working.

Darvell's last day of work was March 3, 2005. He applied for and received short-term disability benefits. Over the next nine months, his symptoms continued to wax and wane, and his doctors adjusted his pain medications. At one point (in May 2005), Dr. Kaiser noted that Darvell "really just cannot use the arms at all at this

point," but this limitation was apparently due solely to pain, as Dr. Kaiser noted that Darvell had "excellent motion in both of his shoulders . . . ."

In June, according to Dr. Kaiser, Darvell was showing signs of radiculopathy, as a neck x-ray showed "significant degenerative change" in one area of his vertebrae. Later, however, Dr. Hausch noted that the x-ray appeared normal. Dr. Edward Martinson (a physical-medicine rehabilitation specialist) recorded, in July, that there were not "significant radicular type features to his pain" and, in October, that there was "[n]o clinical evidence at this time to suggest a cervical myelopathy/radiculopathy."

On October 21, 2005, Dr. Johnson filled out a "physical ability assessment" form indicating that, during an eight-hour work day, Darvell could:

- "continuously" lift up to ten pounds
- "frequently" lift, carry, push, or pull up to 20 pounds
- "occasionally" lift and carry over 100 pounds
- "frequently" sit, balance, stoop, kneel, crouch, and crawl
- "frequently" work around machinery
- "occasionally" stand, reach, perform fine manipulations and simple and firm grasping
- "occasionally" withstand exposure to temperature extremes, wet conditions, and vibrations, and
- "occasionally" work overtime.

On the form, "continuously" is defined as more than 5.5 hours each day, "frequently" as 2.5 to 5.5 hours, and "occasionally" as less than 2.5 hours.

After Darvell's short-term disability benefits expired in September 2005, he applied for long-term benefits. LINA is the Plan insurer and claims administrator. The Plan defines "disabled," in relevant part, as:

An Employee is Disabled if, because of Injury or Sickness,

1. he or she is unable to perform all the material duties of his or her regular occupation, and solely due to Injury or Sickness, he or she is unable to earn more than 80% of his or her Indexed Covered Earnings from working in his or her regular occupation . . . .

The Plan gives LINA the discretion to interpret its provisions and to administer benefits.

For plans subject to the Employee Retirement Income Security Act (ERISA), the Plan Administrator of the Employer's employee welfare benefit plan (the Plan) has appointed the Insurance Company as the Plan fiduciary under federal law for the review of claims for benefits provided by this Policy and for deciding appeals of denied claims. In this role, the Insurance Company shall have the authority, in its discretion, to interpret the terms of the Plan documents, to decide questions of eligibility for coverage or benefits under the Plan, and to make any related findings of fact. All decisions made by the Insurance Company in this capacity shall be final and binding on Participants and Beneficiaries of The Plan to the full extent permitted by law.

On October 19, 2005, LINA denied Darvell's claim for long-term benefits, finding: (1) the symptoms were similar to those he had experienced for years; (2) there was no documentation of a significant physical limitation, such as loss of range of motion or strength in the shoulders; and (3) the medical data did not support that he was unable to perform the material duties of his regular occupation, as defined by the Department of Labor's Dictionary of Occupational Titles ("DOT"). Specifically, the letter stated:

According to the Dictionary of Occupational Titles, your occupation was an Account Executive. This occupation requires light physical demands, which includes lifting, carrying, pushing, pulling 20 pounds occasionally, frequently up to 10 pounds. It includes occasional reaching, handling and fingering. It can include walking and/or standing frequently even though weight is negligible. It can include pushing and/or pulling of arm and/or leg controls.

-5-

Darvell appealed to LINA and submitted more records, including Dr. Johnson's physical ability assessment of October 2005. LINA affirmed its denial. Darvell sued in district court. The district court granted summary judgment for LINA, holding that it did not abuse its discretion in denying Darvell's claim. Darvell appeals, arguing that (1) LINA abused its discretion in ignoring some medical evidence, and (2) LINA abused its discretion by using the DOT description of Darvell's occupation, rather than a description of his actual job duties.

## II.

This court reviews de novo the District Court's grant of summary judgment. *Wakkinen v. UNUM Life Ins. Co. of America*, 531 F.3d 575, 580 (8th Cir. 2008). When an ERISA plan authorizes the claims administrator to determine eligibility for benefits, this court reviews the administrator's eligibility determinations under an abuse of discretion standard. *Id*. Under that standard, an administrator's decision is upheld if it is reasonable, that is, supported by substantial evidence. *Id*. at 583. Substantial evidence means "more than a scintilla but less than a preponderance." *Id*.

When the administrator is also the insurer, the administrator has a conflict of interest that must be weighed in determining whether there is an abuse of discretion. *Metro Life Ins. Co. v. Glenn*, 128 S.Ct. 2343, 2346 (2008). The weight given the conflict depends on the circumstances of the particular case. *Id*. at 2351. Where an insurer has a history of biased claims administration, the conflict may be given substantial weight, but where the insurer has taken steps to reduce the risk that the conflict will affect eligibility determinations, the conflict should be given much less weight. *Id*. In *Glenn*, the record contained little evidence of the insurer's efforts to ensure that the conflict did not affect eligibility determinations. *Id*. The Supreme Court held that, in light of the lack of evidence, the court of appeals properly gave the conflict "weight to some degree," but it was not determinative. *Id*. at 2351-52. As

in *Glenn*, the record in this case contains little evidence about either LINA's claims administration history or its efforts to ensure that claims assessment is not affected by the conflict. Thus, like the court of appeals in *Glenn*, this Court gives the conflict some weight.

A.

Darvell argues that LINA abused its discretion by rejecting the opinions of three doctors that he was disabled. LINA counters that the only evidence in the record that directly addresses his ability to perform job duties is the 2005 physical ability assessment completed by Darvell's own physician, Dr. Johnson — which indicates that he can perform the work of an "account executive" as defined by the DOT.

Darvell cites *Torres v. UNUM Life Ins. Co. of America*, 405 F.3d 670, 681 (8th Cir. 2005), where this Court held that the plan administrator abused its discretion when it ignored the only medical evidence in the record that was relevant to Torres's ability to perform his occupation. *Id*. This is an abuse of discretion because it "rendered plan language meaningless." *Id*. at 680-81.

Here, LINA did discount some medical evidence, but necessarily so as there was conflicting medical evidence whether Darvell was disabled, and, the discounted evidence was conclusory evidence that he was "disabled." It is not an abuse of an ERISA plan administrator's discretion to ignore an opinion when the physician did not "provide[] reliable objective evidence of testing or other proof to support the finding of long term disability." *McGee v. Reliance Standard Life Ins. Co.*, 360 F.3d 921, 924-25 (8th Cir. 2004). Similarly, LINA did not abuse its discretion in discounting some medical evidence in this case.

B.

Darvell asserts that LINA abused its discretion by using the DOT description of Darvell's occupation, rather than a description of his actual job duties. Under the abuse of discretion standard, this court must defer to LINA's interpretation of the plan so long as it is "reasonable," even if the court would interpret the language differently as an original matter. *King v. Hartford Life & Accident Ins. Co.*, 414 F.3d 994, 998-99 (8th Cir. 2005) (en banc). To determine reasonableness, courts apply the five-factor test in *Finley v. Special Agents Mutual Benefit Association, Inc.*, 957 F.2d 617 (8th Cir. 1992): (1) whether the administrator's language is contrary to the clear language of the plan; (2) whether the interpretation conflicts with the substantive or procedural requirements of ERISA; (3) whether the interpretation renders any language in the plan meaningless or internally inconsistent; (4) whether the interpretation is consistent with the goals of the plan; and (5) whether the administrator has consistently followed the interpretation. *Id*. at 621. However, "[t]he dispositive principle remains . . . that where plan fiduciaries have offered a 'reasonable interpretation' of disputed provisions, courts may not replace [it] with an interpretation of their own – and therefore cannot disturb as an 'abuse of discretion' the challenged benefits determination." *King*, 414 F.3d at 999 (citation omitted).

Darvell is not entitled to long-term disability benefits unless "he... is unable to perform all the material duties of his . . . regular occupation." The dispute centers on this clear language of the plan (factor 1 of *Finley)*. The Plan here does not define "regular occupation." The phrase "material duties of his . . . regular occupation" can be interpreted as referring to the duties that are commonly performed by those who hold the same occupation as defined by the DOT (a "generic" approach), or the duties that the specific claimant actually performed for his employer (a "claimant-specific" approach). The circuits are split, under abuse of discretion review, on this issue. *Compare Schmidlkofer v. Directory Distrib. Assocs., Inc.*, 107 Fed. Appx. 631, 633-34 (6th Cir. 2004) (insurer reasonably interpreted "regular occupation" to mean

-8-

the insured's occupation as it is performed in a typical work setting in the general economy), *with **Bishop v. Long Term Disability Income Plan of SAP Am., Inc***., 232 Fed. Appx. 792, 794-95 (10th Cir. 2007) (insurer was required to consider claimant's actual job duties in determining the "essential duties" of his occupation) *and **Lasser v. Reliance Standard Life Ins. Co.***, 344 F.3d 381, 385-86 (3d Cir. 2003) (unambiguous meaning of "regular occupation" is the usual work that the employee is actually performing immediately before the onset of disability).  This court has not decided this issue.[3]

Based on *King*, this Court defers to LINA's interpretation of the disputed phrase, because it is reasonable to apply the DOT description in this case.  The phrase "material duties of his . . . regular occupation" can be interpreted to refer to Darvell's generic occupation, rather than his specific position.  *See **Osborne v. Hartford Life and Accident Ins. Co.***, 465 F.3d 296, 299 (6th Cir. 2007) (In a case where the plan administrator has discretion to interpret plan terms, "'Occupation' is a more general term that seemingly refers to categories of work than narrower employment terms like 'position,' 'job,' or 'work,' which are more related to a particular employee's individual duties.").  The Plan gives LINA the discretion to interpret Plan provisions, and its interpretation of "material duties of his . . . regular occupation" is not contrary to clear language of the Plan.  Here, according to a Yellow Book job description in the record, (A.R. 463-64), an account executive needs to carry ten pounds occasionally and is not required to stand or walk for prolonged periods.  Thus, the DOT description of the occupation is largely consistent with evidence of the duties that Darvell actually performed for Yellow Book.  Because Darvell does not claim that any of the other four *Finley* factors indicate unreasonableness, and because he does not show it was unreasonable to apply the DOT description in this case, LINA did not abuse its discretion in denying his claims.

---

[3]The parties try to draw inferences from *Jones v. Mountaire Corp. Long Term Disability Plan*, 542 F.3d 234 (8th Cir. 2008).  However, *Mountaire* simply does not resolve this issue.

## III.

The  judgment of the district court is affirmed.

———————————————