# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 10-3206

_____

Don Carrow,

        Appellant,

v.

Standard Insurance Company,

        Appellee.

\*
\*
\*
\*  Appeal from the United States
\*  District Court for the Eastern
\*  District of Missouri.
\*
\*
\*

_____

Submitted: September 19, 2011
Filed: January 11, 2012

_____

Before LOKEN, BEAM, and MURPHY, Circuit Judges.

_____

BEAM, Circuit Judge.

Don Carrow appeals the district court's adverse grant of summary judgment in favor of Standard Insurance Company in this Employee Retirement Income Security Act (ERISA), 29 U.S.C. §§ 1001 et seq., benefits case. We affirm.[1]

_____

[1]The Honorable Henry E. Autrey, United States District Judge for the Eastern District of Missouri.

## I.    BACKGROUND

Carrow began employment with Jager Industries in January 2000 as a technical sales representative.  As a full-time employee of Jager, Carrow was eligible for disability benefits under the Group Long Term Disability Insurance Policy (the Plan).  The underwriter and Plan administrator is Standard.  As relevant, the Plan defines "disability" as being disabled from the claimant's "own occupation" (for the first twenty-four months of benefits) and thereafter, being disabled from "any occupation" for which the claimant is "reasonably fitted by education, training, and experience."  The Plan gives Standard full discretion to interpret the terms of the Plan.

In February 2005, Carrow was unable to work due to a diagnosis of avascular necrosis of the right hip, and he underwent a subsequent core decompression surgical procedure on February 16, 2005.  Carrow applied for and was approved for short-term disability (STD) benefits on March 2, 2005, and began receiving a weekly STD stipend.  Carrow was scheduled to return to work in April 2005, but was unable to do so due to pain and complications following the surgical procedure.  Because of the complications and the unsuccessful results of the surgery, Carrow's STD benefits were extended until May 2005, at which time his claim was converted to a long-term disability (LTD) claim.

On September 30, 2005, Carrow underwent a total hip replacement at Barnes-Jewish Hospital, performed by Dr. Burnett.  On February 23, 2006, at a post-operative visit, Dr. Burnett found that Carrow's right hip replacement was "doing great," and that he had bilateral knee osteoarthritis, gout, and left hip osteonecrosis.  Dr. Burnett found Carrow had no disability and Burnett thought Carrow would be a reasonable candidate to return to work at normal duties.  In March 2006, Carrow did return to work and was able to work until June 1, 2006.  At that point, Carrow claimed he could no longer work due to progressive pain in his knees, left hip and spine.  On June 16, 2006, Dr. Mullen, Carrow's primary treating physician, completed a statement

indicating Carrow's diagnosis of median neuropathy; osteoarthritis of the knees, hip and spine; dysesthesia; hypoesthesia; pain in the knees, hip and spine and radiculopathy. Dr. Mullen opined that Carrow could sit, stand and walk four hours a day, occasionally bend/stoop, and alternate between standing and sitting six hours a day. Dr. Mullen also checked a box indicating his opinion that Carrow could "never" return to work.

Carrow was again approved for disability benefits on July 12, 2006. On August 18, 2006, Carrow's claim and medical records were reviewed by a nurse/vocational consultant for Standard, who determined that benefits were appropriate after reviewing the medical records. During July and August 2006, Carrow received injections into both knees as treatment for his osteoarthritis. He received additional injections in September and October 2006. Also during this time, Carrow was diagnosed with bilateral carpal tunnel. On November 6, 2006, Carrow called Dr. Mullen complaining of numbness in his hands. Dr. Mullen recommended a referral for carpal tunnel repair. Carrow indicated that he wanted to wait until after deer season to have carpal tunnel surgery performed. On January 3, 2007, Carrow was seen by Dr. Strecker regarding the carpal tunnel problem, and Carrow subsequently underwent a bilateral carpal tunnel decompression and release. Dr. Strecker's treatment notes from January 17, 2007, indicate that Carrow's symptoms were resolved. Carrow was also approved for Social Security Disability benefits, beginning in January 2007, for which he had applied as required by the Plan.

As previously noted, the Plan provided that twenty-four months after the first LTD[2] payment, the definition of disability changed from the inability to perform one's

---

[2]The point at which Carrow's claim ceased being an own-occupation claim and became instead an any-occupation claim does not appear to be in dispute. And, indeed, the Plan indicates that a period of "temporary recovery"–i.e., when Carrow returned to work in March 2006–does not affect the maximum benefit period of twenty-four months for own-occupation benefits.

"own occupation" to the inability to perform "any occupation." In anticipation of the change in Carrow's claim from an own-occupation claim to an any-occupation claim, on February 27, 2007, Chris Caiazzo, a Standard claims administrator, forwarded a medical questionnaire to Carrow to update his condition. The medical questionnaire was answered by Dr. Mullen, who stated Carrow's primary diagnosis as "total hip replacement" and the secondary diagnosis was multiple degenerative joint disease. Dr. Mullen stated that Carrow had degenerative osteoarthritis in his knees and hip which made ambulation painful and prevented the use of stairs. Mullen further reported that Carrow was not able to lift, pull or carry and that sitting was painful. Dr. Mullen rated Carrow at 70%–meaning Carrow cares for himself but is unable to carry on normal activity or do active work. Dr. Mullen stated Carrow's ability to stand, sit and walk was reduced to only one and two hours per day, but suggested he could push and pull, lift and carry as much as 50 pounds occasionally to frequently, and opined that Carrow was "[n]ot capable of return to 40 [hour] work week."

On June 23, 2007, Dr. Handelsman, D.O., a Standard consultant, reviewed Carrow's file. Dr. Handelsman noted, erroneously, that Carrow had been out of work since February 15, 2005, and that he should have returned to work as of February 23, 2006, as per Dr. Burnett's note.[3] Dr. Handelsman noted that Carrow postponed carpal tunnel surgery until "after deer season," thus the condition could not have been "bothering the claimant too much." In July 2007, a vocational case manager assessed Carrow's education, training and experience as follows: a Bachelor of Science degree; acceptable salary level is $3,019.37 per month; and physical limitations of no prolonged standing or walking without the ability to rest, no repetitive climbing, no squatting, crouching, crawling or kneeling. The report listed several sedentary occupational alternatives comparable with Carrow's abilities, education, training and experience.

---

[3]In fact, Carrow returned to work from March 2006 through June 2006.

On July 31, 2007, Standard notified Carrow that he did not meet the "any occupation" disability definition. Carrow appealed this determination. On August 8, 2007, Dr. Mullen wrote a letter to Standard indicating that Carrow continued to be totally and permanently disabled due to degenerative changes throughout his entire skeletal system, and the letter set forth Carrow's limitations. On August 20, 2007, Dr. Handelsman was asked to review Dr. Mullen's August 8, 2007, letter and consider a telephone call with Dr. Mullen. Dr. Handelsman wrote a note on the bottom of the request indicating there was no new information. On September 18, 2007, a second physician consultation was completed by Hans Carlson, M.D., who stated that a person of Carrow's age and with his limitations should be able to perform sedentary work. In October 2007, Carrow underwent an MRI of his lumber spine, which showed mild L4-5 and L5-S1 disc bulges. Dr. Mullen sent another letter, dated October 19, noting Carrow's knee problems and bulging discs, pointing out the 2005 total hip replacement, the carpal tunnel surgery, and that Carrow also had gouty arthritis of his feet. Dr. Mullen stated that Carrow had atherosclerotic vascular disease of the aorta and that Carrow had difficulty sleeping due to chronic pain and stress. Dr. Mullen concluded by adding that, while none of Carrow's ailments were disabling "in and of themselves," when viewed in combination, Carrow was disabled from doing even sedentary work.

In response to Dr. Mullen's October 19 letter, Standard asked Dr. Carlson to respond to the conclusions in Dr. Mullen's October 19 letter. Dr. Carlson concluded that based upon Carrow's current ailments–mild degenerative changes in the spine, mild (right) and moderate (left) knee arthritis, and successful hip and carpal tunnel surgery–Carrow was capable of doing sedentary work. Dr. Carlson also noted that the sleep and stress problems noted by Dr. Mullen could be further evaluated to determine whether these issues might have an effect on Carrow's disability status. Standard consulted with another physician, Dr. Fancher, regarding Dr. Mullen's reference to vascular disease, stress and chronic pain. Upon review of the medical records in the administrative record, Dr. Fancher concluded that Carrow's prior office notes with Dr.

Mullen did not reflect a diagnosis or referral for cardiovascular disease, sleep problems or stress.

On December 12, 2007, Standard notified Carrow that his administrative appeal was rejected. The notice stated that the "medical information in your claim file is insufficient to support that you have limitations and or restrictions of a severity to prevent you from performing the material duties of any gainful occupation for which you are reasonably fitted by education, training or experience, and there are alternate occupations available for which you qualify." Carrow appeals, arguing that Standard abused its discretion in denying his claim for LTD benefits.

## II.    DISCUSSION

We review de novo the district court's grant of summary judgment regarding an ERISA plan administrator's benefits determination. Manning v. Am. Republic Ins. Co., 604 F.3d 1030, 1038 (8th Cir.), cert. denied, 131 S. Ct. 648 (2010). If, as here, the Plan reserves discretionary power to construe terms or make eligibility determinations, the administrator's decision is reviewed for an abuse of discretion. Id. We will reverse if the Plan administrator's decision was inconsistent with Plan goals, renders other terms meaningless, superfluous or internally inconsistent, conflicts with the substantive or procedural requirements of ERISA, is inconsistent with prior interpretations of the same words, or is contrary to the Plan's clear language. Jones v. Reliastar Life Ins. Co., 615 F.3d 941, 945 (8th Cir. 2010). When, as here, a conflict of interest exists because the Plan is both the decision-maker and the insurer, we take that conflict into account and give it some weight in the abuse-of- discretion calculation. Manning, 604 F.3d at 1038-39.

The Plan administrator did not abuse its considerable discretion in this case. Our precedent indicates that the Plan administrator may rely upon the reports of consulting, non-examining physicians over the reports of treating physicians.

Weidner v. Federal Express Corp., 492 F.3d 925, 930 (8th Cir. 2007). Although one of Dr. Handelsman's reports contained a factual inaccuracy about Carrow's return-to-work history, as discussed below, this was not the only consultant review or report relied upon by Standard in denying benefits. And, Standard did credit the reports of several treating physicians–the doctor who performed Carrow's hip replacement surgery, Dr. Burnett; the doctor who performed Carrow's successful carpal tunnel release in January 2007, Dr. Strecker; and another orthopedic doctor, Dr. Hulsey, who treated Carrow's fractured finger in October 2006. Dr. Strecker reported that the carpal tunnel release had "resolved" Carrow's night pains. In treating Carrow's fractured finger in October 2006, Dr. Hulsey's treatment notes described Carrow as an "active" 59-year-old male. Dr. Burnett did not believe Carrow was disabled in February 2006. None of these doctors had a financial tie to Standard, ameliorating the effect of the conflict of interest in this case.[4] Carrow argues that these doctors did not treat his primary disability, which he alleges is his arthritic knees. However, in March 2007, Dr. Mullen reported that Carrow's "primary" diagnosis was "total hip replacement" and that Carrow could not return to a forty-hour work week. In an October 2007 letter, Dr. Mullen included "carpal tunnel" within the litany of Carrow's disabling conditions, despite the treating surgeon's report that the carpal tunnel release was successful. Standard was within its discretion to make comparisons and credibility assessments among the reports of treating physicians. See Rutledge v. Liberty Life Assurance Co. of Boston, 481 F.3d 655, 660-61 (8th Cir. 2007) (upholding the denial of "any occupation" disability benefits where primary physician insisted that claimant was disabled, while other treating physicians disagreed).

Further, Standard did more than simply rubberstamp the consulting physicians' reports. Each time that Dr. Mullen sent another letter opining that Carrow was completely disabled, Standard's consulting physicians reviewed the correspondence,

_____

[4]Pursuant to 1099-MISC forms provided by Standard as part of their discovery responses, Standard paid Dr. Carlson $83,232.00 and Dr. Handelsman $184,091.68 in miscellaneous income for the 2007 tax year.

and at one point, Standard asked Dr. Carlson to answer specific questions about Dr. Mullen's recommendations. Standard apparently did not find Dr. Mullen persuasive, but did not simply discount his opinion without making further inquiries into Carrow's abilities. Finally, while the Social Security Administration (SSA) found that Carrow was disabled within the meaning of its regulations, Plan administrators are not bound by SSA findings of disability. Id. at 660. The reports of the consulting physicians and Drs. Burnett, Strecker and Hulsey constitute substantial evidence supporting the Plan administrator's decision. Under these circumstances, no abuse of discretion occurred.

## III.  CONCLUSION

We affirm the judgment of the district court.

_____