# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 11-3495

_____

Bobby Gene Hankins,           *
                              *
        Plaintiff - Appellant,  *
                              *  Appeal from the United States
    v.                        *  District Court for the
                              *  Eastern District of Arkansas.
Standard Insurance Company,   *
                              *
        Defendant - Appellee.   *


_____

Submitted: April 18, 2012
Filed: May 14, 2012

_____

Before RILEY, Chief Judge, MURPHY and MELLOY, Circuit Judges.

_____

MELLOY, Circuit Judge.

Bobby Gene Hankins was denied long-term disability benefits by Standard Insurance Company. Hankins sought review of Standard's determination under the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001 *et seq*. The district court[1] granted Standard's motion for summary judgment, finding Standard did not abuse its discretion. We affirm.

_____

[1]The Honorable J. Leon Holmes, United States District Judge for the Eastern District of Arkansas.

Beginning in April 2002, Hankins served as the Director of Commercial Security Operations at Stephens Investment Holdings, LLC. The parties disagree as to how best to characterize the job—Standard determined it was primarily a managerial position, whereas Hankins likens it to being a member of a "private police force"—however there is no genuine dispute over the actual duties of the job. Stephens generally describes the position as requiring Hankins:

> To plan, organize, direct and control the security policies, procedures and programs for all commercial locations in the area of facility security in order to ensure the safety and security of employees and assets; to provide investigation and other security services as required in this capacity.

Stephens further lists eighteen "Essential Duties and Responsibilities" for the position. Although many of those duties are purely administrative or supervisory, the list does include potentially physical requirements such as: "[a]ssist[ing] in responding to all emergency and crisis situations as necessary, including: transporting and assisting incapacitated persons, interceding in physical disturbances, subduing violent individuals, and assisting victims of offenses."

To ensure his fitness for these physical requirements, Hankins had to undergo periodic physical evaluations that tested, *inter alia*, his ability to run or walk one-and-a-half miles in under sixteen minutes, run 300 meters in under sixty-six seconds, and jump at least fifteen-and-a-half inches. While training for these physical evaluations on October 15, 2009, Hankins injured his hamstring. After a series of exams, his treating physician concluded that Hankins was unlikely to ever perform the running and jumping requirements for his evaluations, although he was capable of performing sedentary or light work. Because Hankins was unable to complete his physical

evaluations, Stephens terminated him from his position. On February 8, 2010, Hankins submitted a claim for disability benefits.

Stephens sponsored an employee insurance policy administered by Standard. The Standard policy provided benefits to employees who were disabled from performing their "Own Occupation." The policy stated that Standard had "full and exclusive authority to control and manage the Group Policy, to administer claims, and to interpret the Group Policy and resolve all questions arising in the administration, interpretation, and application of the Group Policy." The policy also offered the following pertinent definitions:

> Own Occupation means any employment, business, trade, profession, calling or vocation that involves Material Duties of the same general character as the occupation you are regularly performing for your Employer when Disability begins. In determining your Own Occupation, we are not limited to looking at the way you perform your job for your Employer, but we may also look at the way the occupation is generally performed in the national economy. . . .

> Material duties means the essential tasks, functions and operations, and the skills, abilities, knowledge, training and experience, generally required by employers from those engaged in a particular occupation that cannot be reasonably modified or omitted. . . .

On March 9, 2010, Standard's vocational case manager, Karol Paquette, submitted a report on Hankins's "Own Occupation Review." Paquette studied Arkansas law regarding the licensing requirement for private security personnel as well as the arresting authority of those private security personnel. Paquette compared Hankins's job description to those contained in the Department of Labor's Dictionary of Occupational Titles (DOT) and noted that, although Hankins's actual job duties included some physical demands, those physical demands were not common in the national economy. She determined that the occupational listing in the DOT that most

closely resembled Hankins's job was "Security Manager (Alternate Title) Any Industry," which the DOT characterized as a sedentary occupation. Relying on Paquette's report, Standard determined Hankins was not disabled and denied Hankins's claim on April 8, 2010.

On December 14, 2010, Hankins requested reconsideration of Standard's denial. Hankins submitted a report by a vocational consultant, Robert White, who opined that Hankins's job at Stephens was similar to law-enforcement type security work. By contrast, White characterized the DOT security description used by Standard as only applying to factory/warehouse/industrial type security work. White offered two other occupational titles from the DOT which he believed more closely resembled Hankins's actual job: Public Safety Officer and Deputy Police Chief.[2] White also criticized Standard's determination for not taking into account Hankins's age, which he explained was a significant vocational factor in social security benefit determinations.

On March 15, 2011, Standard upheld its previous denial of disability benefits. Standard relied upon a second report by Paquette that contested White's conclusions. Paquette noted that White had performed a "transferrable skills analysis" under social security law. She explained that such an analysis was irrelevant under Standard's "Own Occupation" analysis because Standard's determination was governed by the language of the policy, not social security law. Paquette also disputed White's suggestion that occupational titles for government service were more appropriate for Hankins's job, reiterating the limited arrest authority for private security personnel

---

[2]White offered the occupational titles associated with DOT numbers 329.263-014 and 375.267-026. The actual titles are listed respectively as "Public-Safety Officer (government ser[vice])" and "Police Inspector I (government ser[vice])." The listing for Police Inspector also indicates alternate titles of "division commander" and "field control," and its description stated that it "[m]ay be designated Police Chief, Deputy (government ser[vice])."

that she analyzed in her previous report. Paquette asserted that White's conclusions were based only on the few physical requirements in Hankins's job responsibilities, while her previous determination had been based on an occupational title that best reflected Hankins's job in its entirety. Paquette noted that, on the whole, Hankins's job duties were consistent with a high level managerial job and that she believed her initial report to be correct.

Hankins brought suit in federal court to overturn Standard's denial of benefits. On November 1, 2011, the district court ruled on cross summary judgment motions, concluding that Standard's determination was reasonable and not an abuse of discretion. Hankins appeals.

## II.

We review a district court's grant of summary judgment de novo. Hackett v. Standard Ins. Co., 559 F.3d 825, 829 (8th Cir. 2009). Where an ERISA plan gives the administrator discretionary power to construe ambiguous terms or make eligibility determinations, the administrator's decision is reviewed for an abuse of discretion. King v. Hartford Life and Acc. Ins. Co., 414 F.3d 994, 998–99 (8th Cir. 2005) (en banc). In reviewing whether administrators have abused their discretion, we generally ask:

> whether their interpretation is consistent with the goals of the Plan, whether their interpretation renders any language in the Plan meaningless or internally inconsistent, whether their interpretation conflicts with the substantive or procedural requirements of the ERISA statute, whether they have interpreted the words at issue consistently, and whether their interpretation is contrary to the clear language of the Plan.

Finley v. Special Agents Mut. Benefit Ass'n, Inc., 957 F.2d 617, 621 (8th Cir. 1992). However, "[t]he dispositive principle remains . . . that where plan fiduciaries have offered a 'reasonable interpretation' of disputed provisions, courts may not replace [it] with an interpretation of their own—and therefore cannot disturb as an 'abuse of discretion' the challenged benefits determination." King, 414 F.3d at 999 (internal citations omitted).

Hankins argues that because the policy does not use the word "discretion," it cannot have granted Standard discretionary power to construe ambiguous terms. Hankins believes that the court should have applied a de novo review to the administrator's disability determination. The policy's language and our court's precedent do not support Hankins's argument. Although the Eight Circuit requires "explicit discretion-granting language" to appear in a policy in order to trigger a deferential standard of review, see McKeehan v. Cigna Life Ins. Co., 344 F.3d 789, 793 (8th Cir. 2003), Hankins points to no case that says the policy must use the word "discretion." This court has held that policy language granting the administrator sole responsibility for the administration and interpretation of the plan gives discretionary authority that triggers deferential review. Kennedy v. Georgia Pacific Corp., 31 F.3d 606, 609 (8th Cir. 1994). We conclude that Standard's policy language reserving the power to "resolve all questions . . . [of] interpretation" indicates the administrator has discretionary power to construe ambiguous terms.[3] Thus, our standard of review is for abuse of discretion.

---

[3]This interpretation is consistent with Carrow v. Standard Ins. Co., 664 F.3d 1254, 1256 (8th Cir. 2012), aff'g 2010 WL 3434355 (E.D. Mo. 2010). There, we acknowledged without discussion that a policy with the same authority-granting language "gives Standard full discretion to interpret the terms of the Plan." However, the parties in Carrow did not dispute the discretionary power of the policy, and therefore did not ask for a determinative interpretation of the policy's language. See 2010 WL 3434355 at *8.

-6-

Our abuse of discretion review is guided by the Finley factors cited above; however, the only challenge Hankins advances on appeal is that Standard's interpretation of his occupation is contrary to the plain language of its policy.[4] Hankins argues that the plain language of his policy does not give Standard the "right to disregard" his actual duties. In other words, Hankins believes Standard abused its discretion in determining his "Own Occupation" because it did not properly consider the physical demands of his actual job, and instead based its determination solely on the general occupational description contained in the DOT.

We have previously reviewed an ERISA determination that relied on the DOT to establish a claimant's occupation. In Darvell v. Life Ins. Co. of North America, 597 F.3d 929 (8th Cir. 2010), we reviewed an interpretation of the meaning of "regular occupation" in an ERISA plan. We acknowledged that, in the absence of a more precise definition, the phrase could "be interpreted as referring to the duties that are commonly performed by those who hold the same occupation as defined by the DOT (a 'generic' approach), or the duties that the specific claimant actually performed for his employer (a 'claimant-specific' approach)." Id. at 935. We concluded that it was reasonable for a plan administrator to apply the generic approach by using a DOT description instead of the claimant's specific job duties. Id. at 936.

Our decision in Darvell was in accord with a similar conclusion arrived at by the Sixth Circuit. In Osborne v. Hartford Life and Acc. Ins. Co., 465 F.3d 296 (6th Cir. 2006), the Sixth Circuit explained:

---

[4]Below, Hankins also asserted claims about procedural irregularities. The district court noted that most of these arguments were really substantive arguments about Standard's disability determination, and Hankins does not appear to advance any procedural claims on appeal.

Hartford's use of the Dictionary to determine Osborne's "own occupation" was not arbitrary and capricious, but on the contrary was "reasonable." The word "occupation" is sufficiently general and flexible to justify determining a particular employee's "occupation" in light of the position descriptions in the Dictionary rather than examining in detail the specific duties the employee performed. "Occupation" is a more general term that seemingly refers to categories of work than narrower employment terms like "position," "job," or "work," which are more related to a particular employee's individual duties. Although reasonable persons may disagree over the most appropriate methodology for determining a particular employee's "occupation," we cannot say that Hartford transgressed the boundaries of its broad discretion under its insurance policy and the ERISA plan to make disability determinations.

Id. at 299. We also acknowledged in Darvell, however, that other circuits have disagreed with this line of reasoning. See Bishop v. Long Term Disability Income Plan of SAP Am., Inc., 232 Fed. Appx. 792, 794–95 (10th Cir. 2007) (insurer was required to consider claimant's actual job duties in determining the "essential duties" of his occupation); Lasser v. Reliance Standard Life Ins. Co., 344 F.3d 381, 385–86 (3d Cir. 2003) (unambiguous meaning of "regular occupation" is the usual work that the employee is actually performing immediately before the onset of disability).

While these earlier cases help guide our analysis, all dealt with insurance policies that lacked pertinent language that is present in Standard's policy: the Standard policy provides an explicit definition of "Own Occupation." Unlike the policy in Darvell, Standard's policy avoids the ambiguous meaning of "occupation" by explaining that it is not limited to the individual claimant's actual and specific job duties. Standard's policy states that it will determine an occupation based on how similar jobs are "generally performed in the national economy," and it identifies similar jobs based on the "material duties" that are "generally required by employers." It is clear from this definition, and our holding in Darvell, that Standard's use of the

DOT to determine Hankins's "Own Occupation" was not at odds with the plain language of the policy.

Hankins contends, however, that Standard abused its discretion because the occupation it considered did not include the physical requirements he believes were "material duties" of his job. However, the policy language does not focus on an individual claimant's specific duties, but the essential duties that are "generally required by employers." Reasonable persons may disagree over which of Hankins's duties were "generally required by employers," and therefore which DOT description bears the closest resemblance to his actual work. Our standard of review is narrow, and we will not overturn an administrator's determination if it is supported by substantial evidence, which is evidence that is "more than a scintilla but less than a preponderance." See Darvell, 597 F.3d at 934 (internal quotations omitted).

There is substantial evidence supporting Standard's denial of benefits. Its vocational case manager, Paquette, offered analysis of why she believed "Security Manager (Alternate Title) Any Industry" to be the closest fit based on the managerial and supervisory aspects of his job and noted that the physical standards required by Stephens were not generally required for private security managers in the national economy. Paquette also rejected Hankins's assertion that the titles offered by White were applicable. Paquette researched Arkansas law and reasonably concluded private security officers had no greater arrest authority than ordinary citizens.

Finally, Hankins argues that Standard's conflict of interest should weigh in his favor in our abuse of discretion review. "When, as here, a conflict of interests exists because the Plan [administrator] is both the decision-maker and the insurer, we take that conflict into account and give it some weight in the abuse-of-discretion calculation." Carrow v. Standard Ins. Co., 664 F.3d 1254, 1258–59 (8th Cir. 2012). In weighing a conflict of interest together with other factors, "any one factor will act

as a tiebreaker when the other factors are closely balanced, the degree of closeness necessary depending upon the tie-breaking factor's inherent or case-specific importance." Metro. Life Ins. Co. v. Glenn, 554 U.S. 105, 117 (2008). However, the other factors in Hankins's case are not closely balanced. Here, conflict of interest alone is not determinative where there exists substantial evidence on the record supporting the denial of benefits. See id. at 118 (stating it was not improper for the court of appeals to focus more heavily on other factors when, "in context, the court would not have found the conflict alone determinative").

Accordingly, we affirm the decision of the district court.

_____