**Ronnie Glenn TURMAN, Plaintiff**

v.

**STANDARD INSURANCE COMPANY, Defendant.**

**Case No. 3:09–cv–165–DPM.**

United States District Court, E.D. Arkansas, Jonesboro Division.

Aug. 20, 2010.

R. Theodor Stricker, Stricker Law Firm, PLLC, Jonesboro, AR, for Plaintiff.

Richard J. Pautler, Thompson Coburn LLP, St. Louis, MO, for Defendant.

## MEMORANDUM OPINION AND ORDER

D.P. MARSHALL JR., District Judge.

This is an ERISA case with a conflict-of-interest twist. Ronnie Turman, a former Crane Corporation employee, claims that he is entitled to receive at least $33,000.00 in long-term disability benefits under an employee-welfare-benefit plan that Crane sponsored. 29 U.S.C.A. § 1002(1) (West 2008). Standard Insurance Company issued the disability policy to Crane. In June 2006, Turman had a heart condition that required him to stop working. Shortly thereafter, Turman made a claim for short-term disability benefits under the policy. Standard paid that claim. Turman then sought long-term benefits; Standard denied that claim. Turman appealed, and Standard stood firm. Turman then filed this suit under ERISA's civil-enforcement provision, 29 U.S.C.A. § 1132(a), (f) (West 2009).

The parties agree that Standard paid full benefits for two years to Turman under the "own occupation" provision of the policy. Standard then informed Turman that he had exhausted those benefits. Standard told Turman that to get more benefits he would have to establish that his medical condition kept him from performing "any occupation" as the policy defines the term.

Beyond denying Turman's claim for more money, Standard filed a counterclaim against him. Standard contends that it overpaid Turman $19,710.00 under the policy, $16,339.00 of which remains to be repaid. An award of benefits that Turman received from the Social Security Administration in February 2008 drives the overpayment claim. The crux of the administrative law judge's ruling was that, given Turman's physical health, he was entitled to a $20,038.00 lump-sum payment. This payment included retroactive benefits from December 2006 through February 2008. The law judge also awarded Turman a monthly disability benefit of $1,361.00 beginning March 2008.

To support its counterclaim, Standard points the Court to policy language requiring Turman to repay policy-based benefits if he received additional benefits—termed "deductible income"—from another source besides Standard's policy. Standard also references a stand-alone Repayment Agreement that Turman signed in February 2007, in which he promised to repay overpayments arising from a retroactive award of Social Security Benefits.

Here is the conflict-of-interest twist: Turman argues that Standard should be judicially estopped from denying him additional benefits—or recouping an overpayment—because Standard enlisted Allsup, Inc. to get Turman disability benefits before the Social Security Administration. Turman says that the Allsup/Standard alliance is "an unholy" one, with legal consequences for this case.

Turman specifically argues that because Allsup is Standard's agent, Standard cannot fight Turman on his disability issues, having argued to the Social Security Administration that Turman is disabled. Turman also contends Standard has abused the discretion that the parties agree Standard otherwise enjoys under a specific pol-

icy provision.* Standard denies that an improper business relationship exists between it and Allsup; it also denies that an agency relationship exists such that Standard is judicially estopped from pressing its counterclaim.

## I.

Turman was a plant electrician for Crane. Among other tasks, he worked on equipment and troubleshoot problems. He developed symptomatic heart problems in June 2006 and had to stop working. About two months later, Turman had a permanent pacemaker implanted to correct, or at least manage, some heart-rhythm problems. Given how a pacemaker works, Turman's cardiologist ordered him to stop working around electromagnetic fields. The parties do not dispute that Turman can no longer work as a plant electrician. When the pacemaker was implanted in August 2006, Turman's career at Crane ended.

Turman's initial claim under the disability policy went smoothly. Turman made his claim, and Standard agreed that Turman "had presented evidence to establish that because of Physical Disease he was unable to perform with reasonable continuity the 'Material Duties' of his 'Own Occupation'" under the policy. Standard paid full benefits, $1,806.12 per month, from mid-December 2006 through mid-December 2008. The dispute over benefits arose as Standard continued to administer the claim and eventually told Turman that it would evaluate his long-term disability claim under the "any occupation" policy provision.

## II.

The parties have filed cross-motions for judgment on their respective claims. Turman argues that Standard abused its discretion in determining that he is fit enough to work at three jobs as determined by vocational consultants. Turman also argues the medical evidence and his own vocational expert's report. Standard argues that its benefits decision was reasonable and supported by the record.

■ The Court must decide whether Standard abused its discretion by denying Turman additional benefits under the "any occupation" provision. A plan administrator abuses its discretion when it fails to act reasonably when denying a claim. A reasonable decision is "supported by substantial evidence." *Darvell v. Life Insurance Co. of North America,* 597 F.3d 929, 934 (8th Cir.2010). The Eighth Circuit applies a five-factor reasonableness test to an administrator's interpretation of a plan. *Darvell,* 597 F.3d at 935. The parties do not discuss the test, but the Court has used it.

*Metropolitan Life Insurance Co. v. Glenn,* 554 U.S. 105, 128 S.Ct. 2343, 171 L.Ed.2d 299 (2008) also informs the Court's review. In *Glenn,* the Supreme Court held that a conflict of interest arises in ERISA cases when the plan administrator also funds the plan. Here, Standard funds and administers this plan.

A conflict of interest is only important, however, if the abuse-of-discretion call is close. "A conflict of interest can act as a tiebreaker when the issue is close, and can assume great importance where circumstances suggest a higher likelihood that it

---

* The Crane Corporation disability policy gave Standard discretion to administer Turman's claim: "Except for those functions which the Group Policy specifically reserves to the Policyholder or Employer, we have full and exclusive authority to control and manage the Group Policy, to administer claims, and to interpret the Group Policy and resolve all questions arising in the administration, interpretation, and application of the Group Policy."

affected the benefits decision." *Jones v. ReliaStar Life Insurance Co.*, 615 F.3d 941, 946 (8th Cir.2010) (internal quotations omitted).

## III.

■ Standard did not abuse its discretion when it denied Turman more benefits under the policy. The contract's plain terms, the medical evidence, and the vocational reports support this conclusion. Though mindful that a conflict exists, the Court cannot say that Turman has established a close enough call on the benefits question such that the conflict should be given "great importance." Nor do the facts "suggest a higher likelihood that [the conflict] affected the benefits decision." *ReliaStar*, 615 F.3d at 946 (citation omitted). Standard simply stands on its policy, Turman's own cardiologist's report, two non-treating doctors who reviewed Turman's medical file, and a vocational review.

Turman has neither argued nor presented evidence that Standard has "a history of biased claims administration." *Darvell*, 597 F.3d at 934. Finally, Turman has not argued that Standard is flouting its own policy's language. If anything, he acknowledges that the policy is unambiguous. The conflict of interest weighs in the analysis because, post-*Glenn*, no "causal connection" must now be established between the conflict and a claim's denial. *Chronister v. Unum Life Insurance Co. of America*, 563 F.3d 773, 775 (8th Cir.2009). Nonetheless, Turman has not convinced this Court that the conflict has a substantial legal effect. The real dispute is whether Standard reasonably relied upon its contract and the medical and vocational evidence when it denied Turman's claim.

First, the policy language. The term "any occupation" is certainly broad. But Turman signed the policy, does not argue that he is not bound by it for some reason, nor has he argued ambiguity. The contract controls. Here is Standard's "Any Occupation" provision:

> During the Any Occupation Period you are required to be Disabled from all occupations.
>
> You are Disabled from all occupations if, as a result of Physical Disease, Injury, Pregnancy or Mental Disorder, you are unable to perform with reasonable continuity the Material Duties of Any Occupation.
>
> Any Occupation means any occupation or employment which you are able to perform, whether due to education, training, or experience, which is available at one or more locations in the national economy and in which you can be expected to earn at least 60% of your Indexed Predisability Earning within twelve months following your return to work, regardless of whether you are working in that or any other occupation.
>
> Material Duties means the essential tasks, functions and operations, and the skills, abilities, knowledge, training and experience, generally required by employers from those engaged in a particular occupation that cannot be reasonably modified or omitted. In no event will we consider working an average of more than 40 hours per week to be a Material Duty.

After paying benefits to Turman for two years under the "Own Occupation" provision, Standard determined in December 2008 that Turman would have to meet the "Any Occupation" provision. Standard decided that Turman did not satisfy this provision—a decision grounded partly in the available medical evidence about Turman's physical health.

What the doctors concluded about Turman's condition overlaps somewhat with vocational consultants' opinions, but the Court will address them separately. Turman's treating cardiologist, Dr. Anthony

White, completed a medical questionnaire for Standard in October 2008. Dr. White reported that Turman could sit for 4 hours, stand for 1 hour, and walk up to 3 hours. Dr. White noted that Turman could continuously lift 1–10 pounds, frequently lift 11–20 pounds, and occasionally lift 21–50 pounds. But according to Dr. White's report, Turman was never supposed to lift more than 50 pounds.

Standard had two experienced doctors review Turman's medical records—Dr. Henry Garrison and Dr. Steven Beeson. Each doctor wrote a report. Turman does not dispute the reviewing doctors' qualifications. And their opinions are not weakened merely because they did not treat Turman. Standard was entitled to rely on them. *Black & Decker Disability Plan v. Nord,* 538 U.S. 822, 825, 123 S.Ct. 1965, 1967, 155 L.Ed.2d 1034 (2003).

Dr. Garrison reviewed Turman's case in January 2008 and November 2008. After his January consult, Dr. Garrison concluded that Turman should "avoid heavy electrical industrial equipment and electromagnetic radiation," but he otherwise believed that Turman's heart condition required "no restrictions from heavy work in other environments, nor are there any restrictions on the duration of [Turman's] work activity." Some recent "pacemaker assessment data" that Turman had submitted prompted Dr. Garrison's second report. Dr. Garrison concluded that Turman's pacemaker was working appropriately. He also reaffirmed his prior opinion that Turman was "restricted from work[ing] around electromagnetic equipment," and that he may well have difficulty raising his left arm above his head due to the location of the pacemaker, but Turman's "maximum strength level is such that he should be able to perform full-time work up to certainly a medium level." Dr. Garrison also noted that the three alternative occupations identified by one of Standard's vocational experts were "reasonable" based on his reassessment.

Dr. Beeson reviewed Turman's available medical evidence in February 2009 and reported that "[s]edentary, light or medium work would seem reasonable. I can find no evidence in the record that would justify any limitations regarding the duration that [Turman] could sit, stand or walk. Occasional lifting even of objects greater than 50 pounds would not necessarily be contraindicated."

Are jobs available to Turman given his prior education, training, experience, and health? Here, the expert opinions offered directly conflicted. Standard's vocational consultant, Francine Dittrich, provided three options in her January 2008 "Any Occupation" report: Hostler, Dispatcher Maintenance Service, and Small Products Assembly II. Dittrich's report addressed the labor market, wage considerations, Turman's functional capacity, his strength, and transferable skills. She concluded that the three identified jobs "exist in the national labor market in sufficient numbers to allow reentry into the workforce given [Turman's] residual functional capacity and transferable skills. They also meet or exceed the wage consideration[.]"

Turman's vocation consultant, David Elmore, issued a letter report in October 2008. Elmore's report addressed what he called "significant methodological concerns" within Dittrich's earlier report. The vocational experts also drew opposite conclusions. Dittrich identified three jobs that she believed Turman could get and perform. Elmore concluded that Turman "is quite unemployable."

Standard had more vocational information that the parties have not addressed. Kelly Cowger, a vocational case manager who reviewed Turman's case in January 2009, stated that Dittrich had "subsequent-

ly responded to [Elmore's methodological] concerns" in a November 2008 memo. Cowger wrote a detailed report to Standard, addressing the vocational issues that Dittrich and Elmore had raised. Cowger concluded: "two of the three alternate occupations" that Dittrich had identified in January 2008 would be suitable for Turman.

The Court need not compare, contrast, or credit one vocational report over another. Nor must the Court make an independent evaluation of the medical evidence. Instead, the Court must determine whether Standard's denial of Turman's long-term disability under the policy was reasonable based on the record as a whole. *Manning v. American Republic Insurance Co.*, 604 F.3d 1030, 1038 (8th Cir.2010). It was. According to the doctors, and Standard's vocational experts, Turman remains able to do some available jobs. Standard did not abuse its discretion by concluding that Turman is not disabled within the meaning of the "any occupation" provision. "Any reasonable decision will stand, even if the court would interpret the language differently as an original matter." *Manning*, 604 F.3d at 1038. Standard therefore prevails on Turman's claim for more benefits.

## IV.

■ The Court also concludes that Standard is entitled to collect $16,339.00 from Turman based on the disability policy's Reimbursement Agreement. Turman's judicial estoppel defense does not change the Court's conclusion.

The provision on which Standard bases its reimbursement claim provides in part:
- I understand that my Long Term Disability (LTD) benefits may be reduced if I receive other types of income or benefits.
- I understand that my receiving or being eligible to receive Deductible In-

come may result in an overpayment of LTD benefits. I agree to immediately repay The Standard for any such overpayment.
- I understand that I am responsible for sending copies of all notices, awards, or letters I receive to The Standard. I agree to notify The Standard immediately if I receive other income or benefits.
- A complete list of other types of income or benefits can be found in the Group Policy or Plan Document.

The Repayment Agreement, which Turman indisputably signed in February 2007, expressly identifies Social Security Disability as an income source for policy purposes. And the policy itself addresses the deductible-income issue fully. These documents are clear.

The timing of the Repayment Agreement's execution is not a problem. In December 2006, before Turman filed his SSDI case, Standard informed Turman by letter that he "may be entitled to deductible income or benefits that will affect the amount of [his] LTD benefits." Standard then identified Social Security Disability benefits as an example. Standard also warned Turman that deductible income "reduces the amount of your monthly LTD benefit," and that "Standard requires you to pursue any deductible income for which you may be eligible."

Citing *Hossaini v. Western Missouri Medical Center*, 140 F.3d 1140, 1142 (8th Cir.1998) and other cases, Turman argues that Standard is judicially estopped from seeking to recover any overpayment. In essence, Turman contends that Allsup and Standard colluded to reduce Standard's liability under the long-term disability policy. Turman uses the SSDI record that he and Allsup built to make his estoppel argument.

The Court sees no estoppel. First, the law judge's determination is not inherently contradictory with Standard's decision on Turman's claim, or Allsup's argument to the Social Security Administration—given what the Court has been provided. The definition of disability as recited by the law judge does not mirror Standard's "Any Occupation" definition. Cowger's report noted the different disability standards in play.

Further, the law judge did not find that Turman could not work at all. The opposite is true: "[Turman] has the residual functional capacity to perform light work." After applying Social Security law, the law judge concluded that "no jobs that exist in significant numbers in the national economy" were available to Turman. This conclusion, of course, conflicts with Dittrich's report. But that conflict carries little legal weight here because the SSDI ruling is not particularly important under the policy. *Cf. Chronister*, 563 F.3d at 776 (insurer's policy required it to give "significant weight" to the SSA's disability determination).

Standard likely did coax Turman toward Allsup, so Turman would seek deductible income from the Social Security Administration and thus reduce the amount of money Standard would have to pay. For example, in the same letter where Standard told Turman of his obligation to pursue deductible income, Standard also stated: "[b]ecause applying for Social Security benefits can be complicated, The Standard may be able to assist you with your application. We encourage you to contact our office for details." Standard referred Turman to Allsup. Turman ultimately sought and received SSDI benefits with Allsup's assistance. But the record does not establish that Standard deprived Turman of the opportunity to seek other representation before the Social Security Administration if he had wanted it.

Allsup and Standard's relationship is cloudy. To darken what lines exist, Turman has asked the Court to consider two exhibits that he attached to his response to Standard's motion for summary judgment. Standard has moved to strike those exhibits, citing the general principle that courts should not readily reopen an administrative record. *E.g., Barham v. Reliance Standard Life Insurance Co.*, 441 F.3d 581, 586 (8th Cir.2006) (Beam, J., dissenting).

The Court has considered the webpages that Turman submitted because good cause exists to do so: there is a conflict-of-interest under *Glenn;* papers already in the record show that Allsup communicated with Standard about Turman's SSDI case on many occasions; Standard referred him to Allsup; and Standard could not have been surprised by Turman's argument about the Allsup/Standard connection. And courts have looked outside the administrative record when, for example, a party complains about an insurer's lack of good faith—which is the essence of Turman's estoppel defense. *E.g., Liston v. Unum Corp. Officer Severance Plan*, 330 F.3d 19, 23 (1st Cir.2003); *Wildbur v. ARCO Chemical Co.*, 974 F.2d 631, 638 (5th Cir.1992).

Even after considering the webpages, the Court concludes that Turman has not presented substantial evidence that Allsup and Standard had a collusive relationship such that this Court should prevent enforcement of Standard's policy and the Repayment Agreement. Turman knew about the Standard/Allsup relationship and decided to let Allsup handle his SSDI matter. He won. Notwithstanding Standard's prodding, Turman is hard pressed to complain now about his voluntary relationship with Allsup, a relationship which ended in an exceedingly favorable decision by the

Social Security Administration for Turman.

\* \* \*

Turman's motion for judgment, *Document No. 17,* is denied. Turman's motion to strike, *Document No. 22,* is denied. Standard's motion for judgment on its counterclaim, *Document No. 13,* is granted. Standard's motion to strike, *Document No. 20,* is denied. The Court will enter judgment forthwith.

So Ordered.